Filed 2/16/16

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| JASWANT BAINS et al., | C076700 |
| Plaintiffs and Appellants, | (Super. Ct. No. CVCS130609) |
| v. | |
| DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF LABOR STANDARDS ENFORCEMENT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sutter County, Perry Parker, Judge.  Affirmed.

Boutin Jones Inc., Robert D. Swanson, Michael E. Chase, Katherine L. M. Mola, and for Plaintiffs and Appellants.

David Cross for Defendant and Respondent.

1

Prunes are harvested from trees and must be dried to be marketed. Two administrative rules set forth different overtime pay rates for agricultural workers who harvest fruit and for those who process fruit for market; generally speaking, the latter receive more generous overtime pay. This case plumbs the line dividing the workers subject to each respective rule, as applicable to the agricultural practices described herein.

Plaintiffs Jaswant Bains and Piara Gosal, farmers, appeal from an adverse judgment after a court trial in which they sought a declaration that certain of their workers were not subject to the more generous of two wage orders issued by the Department of Industrial Relations, Division of Labor Standards Enforcement (Department or DLSE, as context indicates).

Plaintiffs first contend the trial court lacked jurisdiction because they themselves failed to exhaust administrative remedies. However, we conclude that by submitting the matter for decision by the trial court, plaintiffs invited any such error.

Plaintiffs next challenge the trial court's conclusion on the merits. As we will explain, we find the trial court correctly interpreted the relevant wage orders. Some workers harvest the prunes from the trees, whence they are transported to fixed structures where other workers process them for marketing by drying them. Neither the fact the fixed structures abut the orchards nor the fact that the fruit must be dried in order to be marketed alters this distinction in function between the workers, a distinction the Department has determined merits a difference in providing overtime wages.

Accordingly, we shall affirm the judgment.

## BACKGROUND

The Industrial Welfare Commission has issued a number of wage orders that in part prescribe the overtime rates due to various classes of workers, and the DLSE enforces these orders. (See generally, *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026 (*Brinker*); *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561-562.) The two wage orders at issue in this case, wage orders Nos. 13

and 14, are formal administrative regulations. (See Cal. Code Regs., tit. 8, §§ 11130, 11140.) The parties do not dispute in this case that wage order No. 13 would provide more generous overtime rates than would wage order No. 14. More details about each of these wage orders will be provided, *post*.

*Pretrial Procedure*

On April 2, 2013, plaintiffs sued for declaratory relief seeking an adjudication of which of the two wage orders applied to certain workers. To demonstrate the existence of a justiciable controversy, the complaint attached a letter dated November 9, 2012, from the Department to plaintiffs' counsel, contending that wage order No. 13 applied to certain of plaintiffs' workers. Plaintiffs sought a declaration resolving the interpretive dispute so that they would know how to compensate those workers during the upcoming 2014 agricultural season without threat of penalty.

The Department's answer admitted the gist of the dispute, but in part asserted plaintiffs had failed to exhaust administrative remedies. The Department's trial brief also raised the issue of failure to exhaust administrative remedies, and contended the complaint was premature for this reason. Plaintiffs replied that requiring them to risk citation for underpayment of appropriate overtime wages would be onerous and would in any event ultimately lead to a superior court action to resolve what they characterized as a legal, not factual, dispute.

*Trial*

At the court trial, the parties stipulated that various exhibits would be admitted into evidence, and they are included in the clerk's transcript.

Wage order No. 14 in part covers workers engaged in "[t]he harvesting of any agricultural or horticultural commodity, including but not limited to, picking, . . . field packing, and placing in field containers or in the vehicle in which the commodity will be hauled, and transportation on the farm or *to a place of first processing* or distribution." (Cal. Code Regs., tit. 8, § 11140, subd. 2(D)(4), italics added.) Thus, this wage order,

3

generally speaking, covers employees engaged in a variety of planting, watering, tending, and gathering activities, but not in activities *changing* the nature of the crops.

Wage order No. 13 covers "all persons employed in industries preparing agricultural products for market, on the farm," with specified exceptions. (Cal. Code Regs., tit. 8, § 11130, subd. 1.) Briefly summarized as relevant here, wage order No. 13 covers workers engaged in "*any operation performed in a permanently fixed structure . . . on the farm . . . for the purpose of preparing agricultural . . . products for market . . . and includes all operations incidental thereto*." (Cal. Code Regs., tit. 8, § 11130, subd. 2(H), italics added.) Thus, this wage order, generally speaking, covers employees engaged in altering the crops in some manner to facilitate their marketing.[1]

The only trial witness was a Department employee called by plaintiffs.

Facundo Rosas has been a detective with the Labor Commissioner's Bureau of Field Enforcement since 2006, and inspects farmers in the Sacramento Valley. Bains and Gosal dry their prunes from fruit harvested in their own orchards. Prunes are harvested by shaking trees to dislodge fruit (so-called "French prunes" or fruit still on the tree), which is then collected in bins that are moved to a prune dryer. Prunes are dehydrated in a fixed structure. Rosas disagreed when asked if drying was part of the harvesting process.

Detective Rosas believed that workers in the drying facility were not harvesters and therefore were entitled to the more generous overtime benefits set forth in wage order No. 13. When Rosas spoke to Bains, Bains asserted those workers were to be treated the

---

[1] A treatise briefly summarizes the difference as follows: "Wage Order 13 applies to '*industries preparing agricultural products for market on the farm*.' " (Simmons, Wage and Hour Manual for Cal. Employers (18th ed. 2015) § 2.3, p. 77.) "Employers who merely grow and harvest their own crops . . . and who do not pack, process or otherwise prepare their farm products for market are subject to Wage order 14 and not Wage Order . . . 13." (*Ibid*.)

4

same as those "working in the orchards" who were subject to wage order No. 14 and who therefore received less generous overtime benefits.

Detective Rosas was shown a 2006 document (exhibit 10 at trial) that was "a guide" prepared by the Department for classifying activities pertaining to the two wage orders. The portion of the guide relevant to wage order No. 13 listed activities including "sorting, grading, moisturizing, drying/fumigating, packaging, [and] shipping." Rosas testified that Exhibit 10 was "only a guide" and further testified that in the past--"[m]aybe back in the 50's"--orchardists may have dried prunes in the field, but "nobody" uses that method now, and he had never seen that done in his lifetime. Rosas agreed that one part of the guide pertaining to prunes said "growing, spraying, thinning, picking and drying applies under" wage order No. 14, but testified that was just "a guideline."[2] Rosas testified that fumigation can be done in a prune dryer, as can moisturization, and "some places do sort them, and they grade them by the size of the dried prune." Rosas agreed the term "drying" as used in both parts of the guide was used "in the same sense" but added that in the case of the workers at issue here wage order No. 13 "would apply because . . . those are the specific functions that occur in a prune dryer."

Bains has a separate company--Sacramento Packing--that processes fruit, and had conceded to Rosas that workers there were subject to wage order 13. However, both he and Gosal have drying facilities next to their own orchards in which their own prunes are dried. If either Bains or Gosal left their prunes in bins, they would rot; prunes *must* be dehydrated to be marketable.

---

[2] We note the current version of the guide suggests that "[g]rowing, spraying, thinning, picking, sun or *solar field drying*" (italics added) fall within wage order No. 14, whereas "[s]orting, grading, moisturizing[,] all drying in a structure including oven drying or dehydrator drying, fumigating, packing, packaging, shipping" fall within wage order No. 13. (IWC, Which IWC Order? Classifications (2013) pp. 2, 9 http://www.dir.ca.gov/dlse/WhichIWCOrderClassifications.PDF [as of Jan. 28, 2016].)

5

*Statement of Decision and Judgment*

After considering posttrial briefing and issuing a tentative decision, the trial court issued a statement of decision as follows: Plaintiffs dry their own prunes in their own fixed structures. Prunes are harvested by shaking the prunes off the tree, collecting them in bins, and moving them to be dried. Prunes have not been dried in the orchards since the 1950's, and must be dried to be marketed. Wage order No. 13 refers to operations performed in fixed structures to prepare products for market. Wage order No. 14 refers to harvesting products and placing them in containers where they will be taken to the place of first processing. Wage order No. 13 applies to workers in the drying facility because it is a fixed structure and the work occurs after harvesting, which ends when the prunes are placed in bins to be taken for first processing.

The judgment in part declares that wage order No. 13 applies to the drying of the farmers' own prunes "after the prunes have been delivered to the drying facility during the upcoming prune harvest season in 2014."[3]

After the trial court denied their motion for a new trial, plaintiffs timely filed this appeal from the judgment.

## DISCUSSION

### I

*Exhaustion of Remedies*

Plaintiffs assert the trial court lacked jurisdiction to issue a judgment because no administrative hearing had been conducted to consider the applicability of the wage orders in question to the work done by their workers, and contend the issue of lack of

---

[3] The judgment also references wage order No. 8, which applies where crops are handled by a different entity than the producer of those crops. (See Cal. Code Regs., tit. 8, § 11080; Simmons, Wage and Hour Manual for Cal. Employers, *supra*, at pp. 76-77.)

jurisdiction can be raised at any time in the proceedings. We conclude that any error was invited.

"Where a party by his or her conduct induces the commission of error, the party is estopped from asserting it as a ground for reversal. This application of the estoppel principle is generally known as the doctrine of invited error." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 389, p. 447.) "The appellant cannot submit a matter for determination by the lower court and contend on appeal that the matter was beyond the scope of the issues." (*Id.*, § 390(d), p. 449.)

That is what happened here: Plaintiffs submitted the key interpretive question to the trial court for decision. In their complaint, pretrial brief, posttrial brief, and motion for a new trial, they sought an interpretation of the wage orders in their favor, and they opposed the Department's assertion that administrative remedies had to be exhausted. They cannot now complain that the trial court should not have decided the issue they themselves pressed the trial court to decide.[4]

In an earlier case we held that where a declaratory relief action was filed before an administrative action, and it appeared a party's "only procedure for relief was through the court" but the parties agreed to an administrative hearing, the losing party could not raise exhaustion of remedies. (*State of California v. Superior Court* (1971) 16 Cal.App.3d 87, 95 ["Although this is a declaratory relief action and possibly could have been tried without an administrative hearing being provided, the parties stipulated that an administrative hearing be had . . . . To hold that [real party in interest] is not so estopped means that the six days of administrative hearing was a nullity and waste of time"].)

---

[4] Plaintiffs sought judicial notice in this court of various documents, including prior letter interpretations by the Department and documents pertaining to purported administrative events--including an administrative hearing that resulted in penalties against Bains--that occurred after trial. We granted the request as to the letter interpretations, but denied it as to the administrative documents; therefore, we disregard the parts of the briefing relying on those documents.

7

Although the parties here did not stipulate to an administrative hearing in this case, plaintiffs argued in the trial court that exhaustion was not required. Thus, whether or not that contention was legally correct (see fn. 6, *post*), to allow them to change course now would mean the trial was a nullity and a waste of time. As we said in an analogous context, "it is inappropriate to allow any party to 'trifle with the courts by standing silently by, thus permitting the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 406; see *In re Griffin* (1967) 67 Cal.2d 343, 348 ["A litigant who has stipulated to a procedure in excess of jurisdiction may be estopped to question it when 'To hold otherwise would permit the parties to trifle with the courts' "], *People v. National Automobile & Casualty Ins. Co.* (2000) 82 Cal.App.4th 120, 125-126 [where a court has subject-matter jurisdiction, a party who consents to acts beyond the court's powers is estopped to complain].)

It is true that *subject matter* jurisdiction--the power of the court to act in a certain way--cannot be conferred by the actions of the parties and the lack thereof can be raised at any time. (See *Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1248 (*Saffer*); *Barnick v. Longs Drug Stores, Inc.* (1988) 203 Cal.App.3d 377, 379-380.) But the term "jurisdiction" has many meanings. (See *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 287-288 (*Abelleira*); 2 Witkin, Jurisdiction, *supra*, § 1, pp. 575-576.) Some kinds of jurisdiction *can* be conferred by the actions of the parties. (See, e.g., *Summers v. Superior Court* (1959) 53 Cal.2d 295, 298 ["estoppel may operate to confer jurisdiction over the parties" but cannot confer subject-matter jurisdiction].)

The doctrine of exhaustion of administrative remedies "does *not* implicate subject matter jurisdiction but rather is a 'procedural prerequisite' 'originally devised for convenience and efficiency' and now 'followed under the doctrine of *stare decisis . . . .*' [Citation.] It is 'jurisdictional' only in the sense that a courts' failure to apply the rule in a situation where the issue has been properly raised can be corrected by the issuance of a

writ of prohibition." (*Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222 [whether exhaustion is required "is not the sort of issue which should fall outside the general rule of civil litigation that arguments and objections not raised and preserved in the trial court are waived on appeal"]; see *Abelleira*, *supra*, 17 Cal.2d at p. 293 ["a fundamental rule of procedure" designed to avoid "completely destroying the effectiveness of the administrative body"]; *Saffer*, *supra*, 225 Cal.App.4th at p. 1250 ["other courts have . . . concluded the failure to exhaust administrative remedies does not deprive a court of subject matter jurisdiction, and the defense may be waived" under "exhaustion schemes that were neither mandatory nor part of a statute that explicitly stripped courts of jurisdiction in the absence of" administrative exhaustion].)

In *Sacramento County Deputy Sheriff's Assn. v. County of Sacramento* (1990) 220 Cal.App.3d 280, on which plaintiffs rely, we assumed the failure to exhaust administrative remedies did *not* deprive a court of *subject-matter* jurisdiction, but the issue of exhaustion had been raised in the trial court in that case *by the party raising the exhaustion rule on appeal*. (*Id*. at pp. 285-286.) That is unlike the case at hand, where the parties raising the exhaustion rule on appeal--plaintiffs here--actively resisted application of that rule in the trial court.[5]

---

[5] Also distinguishable is *Tushner v. Griesinger* (1959) 171 Cal.App.2d 599, on which plaintiffs also rely. There, the plaintiffs sued during the pendency of administrative hearings against their professional licenses, alleging the code provisions they allegedly violated were unconstitutional; the trial court ruled against them. (*Id*. at p. 600.) The agency had partly demurred based on lacked of subject matter jurisdiction, and in its answer raised the defense of failure to exhaust administrative remedies. (*Id*. at p. 604.) The administrative hearing officer rejected the constitutional claim, but further administrative hearings were scheduled. (*Id*. at p. 605.) Unlike in this case, the agency on appeal argued exhaustion of remedies precluded the trial court's action. (*Id*. at p. 604.) The appellate court, citing *Abelleira*, and observing that further administrative proceedings had taken place, reversed the judgment and ordered the trial court to dismiss

9

Plaintiffs do not point to any statutory provision that compels adjudicating disputes about wage orders via an administrative action before resorting to court action. Nor have they provided any persuasive reason why we should not apply the invited error doctrine and allow them to disavow their tactical choice by insisting on a trial to resolve the interpretive controversy between the parties.[6]

Accordingly, we find any error to have been invited and decline to consider the claim on its merits.

---

the action. (*Id*. at pp. 607-608.) But the decision did not hold that failure to exhaust administrative remedies deprived a trial court of *subject-matter* jurisdiction.

[6] A leading treatise discusses the "troublesome question" that arises "when adequate administrative remedies are available, but a party seeks judicial relief before a formal administrative action, such as the filing of a disciplinary accusation is instituted. In *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, the licensee filed a declaratory relief action challenging the constitutionality of the entire licensing statute. The court observed that even though the agency had commenced an investigation before the court action was filed, no administrative accusation had been filed before institution of the court action." (Engeman, Cal. Admin. Hearing Practice (Cont.Ed.Bar 2d ed. 2013) Decision and Review, § 8:115, pp. 8:75-8:76.) Some language in *Eye Dog Foundation* lends support to the idea that exhaustion was not required herein: "We agree with plaintiff that an investigation is not the equivalent of a formal accusation compelling it to seek relief from the administrative body before recourse to the courts . . . ." (*Eye Dog Foundation*, at pp. 543-544.) Witkin characterizes *Eye Dog Foundation* as a case where there was no effective administrative remedy. (3 Witkin, Actions, *supra*, § 336, pp. 436-437; see *SJCBC LLC v. Horwedel* (2011) 201 Cal.App.4th 339, 348-349.) Thus there was *some* authority supporting plaintiffs' trial court contention that exhaustion was not required because no formal administrative action was then pending, and their claim that they needed to file an action to allow them to avoid suffering penalties in the event their interpretation failed.

## II

### *Application of the Relevant Wage Orders*

Plaintiffs contend the trial court misinterpreted the relevant wage orders, both on the facts at trial and also in light of administrative interpretations (not presented to the trial court during the course of the litigation below) regarding agricultural products other than prunes. As we shall explain, we disagree with each of these two contentions, which we address separately.

A. *Factual Determinations*

Plaintiffs assert that the trial court was wrong to consider the testimony they presented at trial because their claim addresses a purely legal issue about the interpretation of the relevant wage orders. This is not entirely correct.

We agree that wage regulations are interpreted in the same manner as statutes, a task which generally presents a legal question subject to de novo review. (See, e.g., *Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 1021; *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 28-29.)

However, "legal issues arise out of facts, and a party cannot ignore the facts in order to raise an academic legal argument." (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 291.) The meaning of language hinges on its *application* to a given set of facts. (See, e.g., *In re C.C.* (2009) 178 Cal.App.4th 915, 921 ["The meaning of words is always contextual"]; *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 177 Cal.App.3d 855, 859, fn. 1 ["There cannot be an ambiguity . . . unrelated to an application"].) "[I]n addressing [a party's] issues we will not be drawn onto inaccurate factual ground." (*Western Aggregates, Inc.*, at p. 291.) We presume the trial court's findings are supported by the evidence, and it is plaintiffs' burden, as the appellants, to show that they are not. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

11

We therefore agree with plaintiffs that *where the facts are undisputed*, whether a particular wage order applies to these undisputed facts presents a purely legal question. "When a wage order's validity *and application* are conceded and the question is only one of interpretation, the usual rules of statutory interpretation apply." (*Brinker*, *supra*, 53 Cal.4th at p. 1027, italics added.) But here, plaintiffs contest some of the factual findings made by the trial court, therefore the case does not present a purely legal question.

As we have explained, wage order No. 14 covers workers engaged in "harvesting . . . including but not limited to picking, . . . field packing, and placing in field containers or in the vehicle in which the commodity will be hauled, and transportation on the farm or *to a place of first processing*." (Cal. Code Regs., tit. 8, § 11140, subd. 2(D)(4), italics added.) Clearly, shaking fruit off the trees and collecting them in bins where they will be moved to the drying sheds--the "place of first processing"--falls within this wage order.

Wage order No. 13 covers workers engaged in "*any* operation performed in a *permanently fixed structure* . . . on the farm . . . for the purpose of preparing agricultural . . . products for market." (Cal. Code Regs., tit. 8, § 11130, subd. 2(H), italics added.) That includes operations conducted in the "place of first processing" referred to by wage order No. 14. There is no dispute that the drying sheds in question are "permanently fixed structures" next to the orchards, and no dispute that the fruit must be dried in preparation for market. The fact this wage order applies to "any" operation in a fixed structure means the processing of the fruit by drying is encompassed within the order. " 'Generally, "any" means *all* or *every*. "From the earliest days of statehood the courts have interpreted 'any' to be broad, general, and all embracing." ' " (*Siskiyou County Farm Bureau Federation v. Dept. of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 430.)

Against this view, plaintiffs offer unpersuasive alternative views.

Primarily, plaintiffs object that the trial court considered testimony about the meaning of "harvest" when, in their view, the trial court should have treated the language of the wage orders as a pure legal issue. The statement of decision observes that Rosas's trial testimony showed that the process of drying prunes was not part of the harvesting prunes. It goes on to point out that "by its very terms, Work Order 14 does not apply once the commodity has been transported to the 'place of first processing,' which reasonably means where the prunes are dried."

It was not error for the trial court to accept Rosas's undisputed testimony--on direct examination by counsel for plaintiffs--that the "harvest" had ended once the prunes are shaken off the trees and placed in bins that are moved to be dried. Although plaintiffs denigrate this testimony as no more than Rosas's personal definition of the term "harvest," he was an experienced agricultural investigator and there was no objection that he lacked the knowledge or expertise to give such testimony. If plaintiffs had any contrary evidence explaining how they harvest and process their fruit, they were free to introduce such evidence at trial. Instead, they chose to rest their case on certain exhibits and on Rosas's testimony about their agricultural practices--testimony to which they lodged no pertinent objections.

Plaintiffs also place reliance on the very last passage of the trial testimony. On redirect examination by their counsel, the following exchange occurred:

"Q. And when does a prune farmer finish the harvesting of his crop? Not in the time of day but in a cycle of a work cycle.

"A. Can you be more specific with your question?

"Q. Yeah. In other words, if he's harvesting his prunes, what is the last thing he needs to do to have a prune to sell?

"A. Well, it needs to be dehydrated."

In their new trial motion, and impliedly on appeal, plaintiffs view this as testimony to the effect that dehydrating prunes is part of the harvesting process. We disagree. Read in context, mindful that we must view the evidence in the light most favorable to the judgment, and given Rosas' other testimony, the ambiguous answer merely showed that drying was needed before prunes could be marketed, not that drying was a component of the harvesting process. Indeed, in another part of their briefs, albeit without citation to the record, plaintiffs concede that "[s]ignificant work remains" to bring prunes to market even after they are dried.

Accordingly, based on the evidence at trial introduced by plaintiffs' own witness, the trial court's conclusion that harvesting ends and processing begins after the fruit is transported from the orchards to the fixed drying sheds was correct, and therefore the court correctly concluded that the more generous wage order for processing workers, rather than the wage order for harvesters, applied to the workers in the drying sheds.

B. *Administrative Interpretation*

Plaintiffs also seek support in four DLSE opinion letters, of which we previously took judicial notice.[7] They contend these letters show the Department has previously treated drying as part of the act of harvesting (and thus subject to wage order No. 14), rather than an act of processing agricultural products for market (and thus subject to wage order No. 13), and we should defer to such administrative interpretation of the Department's own wage orders.

We are not persuaded that we should consider these letters at all, and in any event we do not find that they advance the interpretive claims raised by plaintiffs.

---

[7] Such DLSE opinion letters may provide useful--but non-binding--guidance for interpreting wage orders. (See *Brinker*, *supra*, 53 Cal.4th at p. 1029, fn. 11.)

14

First, we are reviewing a judgment after a court trial, and these letters were not introduced into evidence or considered by the trial court. "As a general rule, documents not before the trial court cannot be included as a part of the record on appeal. [Citation.] Although a reviewing court may take judicial notice of matters not before the trial court . . . the reviewing court need not give effect to such evidence. 'Having taken judicial notice of such a matter, the reviewing court may or may not apply it in the particular case on appeal.' " (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1.) Although we previously took judicial notice of the documents, it seems inappropriate to consider them now, because of their belated presentation in this litigation.

Second, the letters do not advance plaintiffs' claims because they address other agricultural products that are not similar to the fruit at issue here.

Three of the letters address cut flowers and one addresses eggplants. Each of the three letters involving cut flowers emphasizes the unique nature of that industry, with the most recent letter explaining that, "Other industries will have to be examined on a case-by-case basis." (Dept. of Industrial Relations, DLSE Opn. Letter No. 1997.03.04 (Mar. 4, 1997) p. 2; see also Dept. of Industrial Relations, DLSE Opn. Letter No. 1989.06.09 (June 9, 1989) p. 1 ["minor differences can lead to different results"]; Dept. of Industrial Relations, DLSE Opn. Letter No. 1989.04.21 (Apr. 21, 1989) p. 4 ["Each situation . . . analyzed on its own merits and facts"].) Similarly, the letter involving eggplants emphasizes there are "many different fact situations in this industry, many of which are specific not only to the type of crop but also to the operations of the individual farm." (Dept. of Industrial Relations, DLSE Opn. Letter No. 1998.09.14-1 (Sept. 14, 1998) p. 2.) Thus, before we describe the content of the DLSE letters tendered by plaintiffs, we observe that each emphasizes the unique nature of different agricultural products, and none purports to set forth a rule applicable to *all* agricultural products.

### 1. *Eggplants*

The eggplant letter explains that eggplants must be cooled immediately after picking to prevent over-ripening; eggplants are immersed in cold water and wrapped in moist paper after being transported in tubs "to a central location on the farm" and then are transported elsewhere for placement in cold storage. (Dept. of Industrial Relations, DLSE Opn. Letter No. 1998.09.14-1 (Sept. 14, 1998) p. 1.) The letter finds that the initial cooling is part of the harvest (i.e., subject to wage order No. 14), not the processing (i.e., subject to wage order No. 13), of eggplants: "[T]he distinction is whether the preliminary post-harvest acts are contiguous thereto, such as field sorting and packing. In the instant fact situation as described . . . the water immersion takes place *contemporaneous with the field packing* of the vegetables. Moreover the arrest of continued ripening is akin to removing the vegetables from the vines to discontinue growth. Thus, the water immersion and wrapping would be covered by Wage Order 14." (*Id*., p. 2, italics added.)

However, the fruit in this case is removed from the field and taken to a fixed structure next to the orchards, where it is then dried to prevent rotting. Thus, the eggplant letter, involving cooling of crops *during field packing*, is not persuasive herein. The act of cooling eggplants retains them in their condition at the moment of harvesting; in contrast, drying prunes *changes* their condition at the time of harvesting.

### 2. *Cut Flowers*

The earliest cut flower letter describes that flowers are cut and placed into containers in the field and then taken to a grading room where "graders" sort them into bundles by length, bud size and degree of opening of the bud. (Dept. of Industrial Relations, DLSE Opn. Letter No. 1989.04.21 (Apr. 21, 1989) p. 1.) The graders were deemed not to be part of the harvesting process, but part of the marketing process, because grading flowers did not fall under the concept of "field packing," which "should be confined to packing that is incidental and attendant to the harvesting of the product.

16

. . . Once the harvesters have turned the flowers over to the graders, then it seems . . . there has been a break in, or termination of, the harvesting process as contemplated by [wage order No. 14]." (*Id*. at pp. 2-3.) The second letter was a follow-up to or clarification of the first letter. It addressed a fact pattern where "first bunching" of the cut flowers is performed either in the field, greenhouse, or sun shed, where "employees bunch the cut flowers into bunches appropriate for the species. After being bunched, the flowers are placed in containers of water. Final or further grading or sorting is then performed on the bunched flowers." (Dept. of Industrial Relations, DLSE Opn. Letter No. 1989.06.09 (June 9, 1989, p. 1.) The letter concludes, with evident hesitation, that this " 'first bunching' would normally involve work under Order 14 [i.e., harvesting work] as long as further grading and sorting that is performed . . . is significant enough that the first bunching or field grading allowed by Order 14 has not swallowed up the requirement that final grading be performed under . . . Order 13 [i.e., market-preparation work]." (*Id*. at p. 2.)

Neither of these two letters support plaintiffs' position here, because there is no need to treat fresh or "French" prunes in the way flowers are bunched and graded, and then kept in water to preserve them. Again, as explained regarding the eggplant example, the purpose of drying prunes is to *change* their harvested state.

The third cut-flower letter emphasizes "continuing changes in the California cut flower industry" but emphasizes the need "to recognize the real differences between Orders 13 and 14." (Dept. of Industrial Relations, DLSE Opn. Letter No. 1997.03.04 (Mar. 4, 1997) p. 1.) The letter explains that "it is the Department's position that the most important element in determining whether the work is to be considered under Order 13 or Order 14 is whether the packing work done on the product is designed to prepare that product for market or whether further significant processing is necessary before the product may enter the market." (*Ibid*.) "Again, the key inquiry is whether the operations

17

constitute 'final grading and packing' and not field grading and shipment to the place of processing for retail consumption." (*Id*. at p. 4.)

Plaintiffs emphasize the last passage and assert significant work *after* drying must be done to bring prunes to market. But the passage they rely on does not undermine the fact that they move prunes out of the orchard into a nearby fixed structure for the purpose of changing the harvested state by drying the prunes. That equates to moving them to a place of "first processing" which demarcates the end of harvest activity governed by wage order No. 14 and the beginning of marketing activity governed by wage order No. 13. Thus, this last opinion letter involving cut flowers, a completely different product that requires different handling than prunes, is not persuasive herein.

Part of the third cut-flower letter also addressed *dried* flowers, which are placed on trays and loaded into dryers to *preserve their color*. (Dept. of Industrial Relations, DLSE Opn. Letter No. 1997.03.04 (Mar. 4, 1997) p. 3.) The letter concedes it was a " 'gray area' " that *might* be deemed marketing activity, but concludes the time spent was de minimis and the activity should be treated as part of the harvest. (*Ibid*.) Here the purpose of drying fresh prunes is not to preserve their natural state--like preserving the natural color of dried flowers--but to *change* their natural state with an eye toward marketing them. Further, there was no evidence about how much time is spent by workers who might both collect prunes and then dry them, thus there is no basis for concluding the drying activity is de minimis herein.

C. *Conclusion*

The record supports the trial court's view that the harvest is over when the raw prune fruit is collected in the fields and then transported to a "fixed" structure for drying, the act of "first processing" as those terms are used in wage orders Nos. 13 and 14. Accordingly, while workers are operating in the drying sheds, they are entitled to be treated as processors, rather than harvesters, under the relevant wage orders.

## DISPOSITION

The judgment is affirmed.  Plaintiffs Bains and Gosal shall pay the Department's costs on appeal.  (See Cal. Rules of Court, rule 8.278.)

                  /s/                   

Duarte, J.

We concur:

      /s/                

Nicholson, Acting P. J.

      /s/                

Hull, J.